IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILA LADENHEIM, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| STARR TRANSIT COMPANY, INC., et al. | : | NO. 16-739 |

### MEMORANDUM

**Padova, J.**                                                                     **March 16, 2017**

Plaintiffs Mila and Leonard Ladenheim brought this suit against Defendant Starr Transit Company, Inc. after Ms. Ladenheim was injured while riding a bus operated by Defendant. Plaintiffs assert a single claim of negligence against Defendant. The parties have completed discovery and Defendant has moved for summary judgment.[1] In addition, Plaintiffs have moved to amend their Complaint to include a claim for punitive damages. For the following reasons, we deny both Motions.

## I.      BACKGROUND

The relevant evidence in the summary judgment record is as follows. Plaintiffs Mila and Leonard Ladenheim are Pennsylvania residents. (Stipulated Material Facts ("SMF") ¶¶ 1-2.) Defendant Starr Transit is a New Jersey corporation with its principal place of business in Trenton, New Jersey. (Id. ¶ 3.) On January 18, 2016, a bus operated by Defendant picked up Plaintiffs and other passengers in Bala Cynwyd, Pennsylvania to take them to a wedding in New York City. (Id. ¶¶ 4-5.) Richard Joyce, a New Jersey citizen, drove the bus. (Id. ¶¶ 6-7.) Joyce made an announcement at the beginning of the trip instructing everyone to remain seated while the bus was moving unless they had to use the restroom. (Id. ¶ 19; Julia Strassman Dep. at 19-

---

[1] Starr Tours, Inc. is also named as a Defendant in this action. However, only Starr Transit filed a summary judgment motion.

20.)  Passengers Jeff Sandler, Julia Strassman, and Joyce himself testified that Joyce made no other announcements during the trip and did not tell anyone to sit down, wear seatbelts, or observe the signs on the bus.  (Sandler Dep. at 14; Julia Strassman Dep. at 20; Joyce Dep. at 61-62.)  However, another passenger, Phyllis Kosloff, testified that Joyce warned all passengers "several times" to remain seated, both before and during the trip.  (Kosloff Dep. at 16.)

The passengers gave varying descriptions of Joyce's driving during the trip.  Kosloff testified that there was no unusual braking or swerving during the trip, stating that "it was just driving."  (Id. at 19-20).  Julia Strassman recalled that the driving was a "little jerky" but was nothing out of the ordinary.  (Julia Strassman Dep. at 22, 32.)  Ira Strassman also testified that he had "no recollection of anything out of the ordinary" during the bus trip.  (Ira Strassman Dep. at 59.)  On the other hand, Stanley Sved said the driver was "riding the brake" and stopping in a way that caused passengers to "jolt[] forward."  (Sved Dep. at 37.)  Leonard Ladenheim and Jeff Sandler similarly described Joyce as hitting the brake hard and causing sudden stops.  (Sandler Dep. at 20-21; Leonard Ladenheim Dep. at 32.)

Erwin Gorlechen was a fellow passenger on the bus.  Gorlechen testified that he stood in the bus aisle, instead of sitting in his seat, for much of the trip.  (Gorlechen Dep. at 67-68.)  Leonard Ladenheim described Gorlechen as being "unable to keep his feet" and unstable during the trip, though he continued to stand.  (Leonard Ladenheim Dep. at 49, 51.)  He also testified that he told Gorlechen to sit down, but Gorlechen remained standing.  (Id. at 52.)  Joyce testified, however, that he did not see Gorlechen in the aisle during the trip.  (Joyce Dep. at 37.)  When asked if he would have told Gorlechen to sit down had he seen Gorlechen in the aisle for half an hour, Joyce replied that he had "never had a passenger . . . stand in the aisle" for that length of

time and that he had never been in a situation where he had to tell a passenger to sit down because they had been standing for fifteen minutes or more.  (Id. at 94.)

The bus encountered heavy traffic while approaching the George Washington Bridge. Joyce testified that he slowed the bus to ten miles-per-hour while approaching the Bridge, but then drove the bus between ten and fifteen miles-per-hour when on the bridge.  (Id. at 36-39, 42.) The other passengers confirmed in their testimony that the bus encountered significant traffic while approaching the bridge and that the traffic continued on the bridge.  (Sved Dep. at 50; Julia Strassman Dep. at 21, 32; Mila Ladenheim Dep. at 87, 90.)  Around this time, Mila Ladenheim approached Joyce, sat on the steps next to Joyce in the front of the bus, and asked him about the route they were taking to the wedding and if the traffic would affect the bus's expected arrival time at the wedding.  (Joyce Dep. 33-34; Mila Ladenheim Dep. at 87, 90.)  Ms. Ladenheim testified that she sat on the bus's steps for "'five to ten minutes'" while the bus was negotiating traffic.  (SMF ¶ 12 (quoting Mila Ladenheim Dep. at 94).)  Joyce testified that the two talked while Ms. Ladenheim sat on the steps.  (Joyce Dep at 34-35.)  Joyce admitted that he did not ask Ms. Ladenheim to return to her seat or leave the steps because he had already made an announcement at the beginning of the trip and Ms. Ladenheim was an adult.  (Id. at 21, 35, 99.) He further acknowledged that "[w]here she was sitting was not the greatest place to sit."  (Id. at 35.)

Mila Ladenheim described what happened next in her deposition:

> "I noticed considerable slowing down, and I noticed that Mr. Joyce was trying to get out of a lane.  He put the blinker on to go to the right, and he was glancing at that window several times because obviously people – it seemed that people were not letting him in but he was intent to change lanes because ours wasn't moving much, but the other one was.  I would say in the last minute or so I was very attentive to what was going on.  The attempt was unsuccessful, but the car in front of us came to a full stop, at which

point I yelled 'watch out,' was a natural response.  He hit a hard brake, and we almost hit the car in front of us."

(SMF ¶ 14 (quoting Mila Ladenheim Dep. at 106).)   At this time, Gorlechen fell on top of Ms. Ladenheim.  (Laytin Dep. at 21-22; Leonard Ladenheim Dep. at 69; Jeff Sandler Dep. at 58.) Ms. Ladenheim testified that after the accident she could not move her extremities, and other passengers testified that they heard her saying that she was in pain and was "not OK."  (Mila Ladenheim Dep. at 118; Joyce Dep. at 38; Leonard Ladenheim Dep at 94.)  Joyce drove straight to the hospital and dropped off Ms. Ladenheim.  (Joyce Dep. at 126-27.)   As a result of the accident, Ms. Ladenheim suffered serious spinal injuries and required two surgeries.  (See Dr. Riew Aff. ¶¶ 2-4.)

Passengers gave conflicting accounts of both the severity of the stop that preceded Gorlechen's fall and the effect that the stop had on other passengers.  Sid Laytin described the stop as a "short stop" where "the bus driver strongly applied the brakes and the bus slowed dramatically."  (Laytin Dep. at 27, 30.)  Jeff Sandler said "[i]t was like someone slammed on their brakes and [the bus] came to a complete stop."  (Sandler Dep. at 49.)  He also testified that Gorlechen went flying backward when the bus braked.  (Id. at 47, 57-60.)  Leonard Ladenheim testified that the sudden stop caused him to feel like he "was lifted up out of [his] seat." (Leonard Ladenheim Dep. at 75; see also id. at 69.)  Moreover, he said that the stop caused Gorlechen to "literally start[] to fly through the air."  (Id. at 69.)

Other passengers had different views.  Gorlechen testified that he did not lose his balance because of a sudden stop or swerve, saying "I fell.  That's all."  (Gorlechen Dep. at 98-99.)  Stan Sved stated that he perceived "excessive braking" on the bus around the time of the accident, but that when the accident happened he, "as well as other people on the bus . . . were pretty much unaware of it."  (Sved Dep. at 64.)  Sved also stated that he didn't "see anything flying off the

4

seats" at the time of the accident.  (Id. at 65.)  Phyllis Kosloff said that she "did not get jolted out of [her] seat at any time," and that had she been thrown out of her seat during the trip, she would have remembered.  (Kosloff Dep. at 42, 83.)  Julia Strassman testified that she perceived nothing unusual at the time of the accident, and Ira Strassman said that he had no recollection of the bus braking suddenly before the accident.  (Julia Strassman Dep. at 43, Ira Strassman Dep. at 19.)  Additionally, the bus was outfitted with a GPS tracking service that includes a feature that automatically reports a "hard stop alert" when the bus decelerates by more than seven miles-per-hour.  (French Aff. ¶¶ 2-6.)  The CEO of the GPS company reviewed the data from the trip and verified that there was "no hard stop alert."  (Id. ¶ 8.)  Finally, Defendant's Director of Transportation executed an affidavit in which he stated that the bus was equipped with a Drive Cam, which records video ten seconds before and ten seconds after a "trigger event" caused by a collision or hard braking.  (Graff Aff. ¶¶ 5-7.)  He stated that no Drive Cam footage was triggered for that trip.  (Id. ¶¶ 10-12.)

The passengers also gave differing accounts as to where the accident took place.  Joyce believed that the bus was one-third of the way across the George Washington Bridge at the time of the accident, which would mean the accident occurred in New Jersey.  (Joyce Dep. at 30.)  Stan Sved said the accident occurred "right before the approach or right as we were going on to the [George Washington Bridge]," which would also place the accident in New Jersey.  (Sved Dep. at 58.)  Julia Strassman testified that she did not think the bus had crossed the George Washington Bridge at the time of the accident.  (Julia Strassman Dep. at 38.)  Leonard Ladenheim stated that the accident occurred after the bus had passed the "Welcome to New York State" sign on the George Washington Bridge, placing the accident in New York.  (Leonard

Ladenheim Dep. at 25).  Gorlechen testified that the accident occurred when the bus had already crossed the George Washington Bridge into the Bronx.  (Gorlechen Dep. at 31, 34, 78.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248, (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.  In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).  If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do

6

not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'"  Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

## III.   DISCUSSION

Defendant moves for summary judgment on Plaintiff's sole claim for negligence, and we consider that Motion before addressing Plaintiffs' Motion for Leave to Amend the Complaint.  In analyzing Defendant's Motion for Summary Judgment, we first determine which state's law to apply to this dispute and then consider the Motion's merits.

A.    Choice of Law

The parties disagree as to which state's law should apply to this case.  Plaintiffs argue that New York law applies, while Defendant argues that we should apply Pennsylvania law.  We find that both parties are incorrect and will apply New Jersey law.

Federal courts sitting in diversity apply the choice of law principles of the forum state. See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of America, 693 F.3d 417, 432 (3d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)) (additional citation omitted).  Pennsylvania uses the following framework in deciding which state's laws are applicable.   The first step is to determine "whether a conflict exists between the laws of competing states."  Budtel Assocs., LP v. Continental Cas. Co., 915 A.2d 640, 643 (Pa. Super.

Ct. 2006) (citing <u>Wilson v. Transp. Ins. Co.</u>, 889 A.2d 563, 570 (Pa. Super. Ct. 2005)).  If there is no conflict between the laws of competing states, no further analysis is necessary and courts apply the law of the forum state.  <u>See</u>, <u>e.g.</u>, <u>State Farm Fire & Cas. Co. v. Holmes Prods.</u>, 165 F. App'x 182, 185 n.1 (3d Cir. 2006) ("[B]ecause there is no conflict between the laws of other states that may have an interest . . . a court shall apply the law of the forum state."); <u>Austin v. Dionne</u>, 909 F. Supp. 271, 274 (E.D. Pa. 1995) ("[I]f the law of either jurisdiction may be applied without impairing the governmental interests of the jurisdiction whose law is not being applied, no conflict exists . . . and the court should apply the law of the forum." (citation omitted)).

When there are relevant differences between the competing states' laws, courts must examine the governmental policies underlying each law and classify the conflict as "true," "false," or "unprovided for."  <u>See</u> <u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 230 (3d Cir. 2007).  A false conflict occurs when "'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.'" [2] <u>LeJeune v. Bliss-Salem, Inc.</u>, 85 F.3d 1069, 1071 (3d Cir. 1996) (quoting <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170, 187 (3d Cir. 1991).  When a false conflict exists, courts apply the law of the only interested jurisdiction. <u>See</u> <u>Garcia v. Plaza Oldsmobile Ltd.</u>, 421 F.3d 216, 220 (3d Cir. 2005) (citation omitted).  A case

---

[2] The United States Court of Appeals for the Third Circuit has explained the distinction between there being "no conflict" between state laws and there being a "false conflict" as follows:

> We think it is incorrect to use the term "false conflict" to describe the situation where the laws of two states do not differ. If two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an *actual* or real conflict between the potentially applicable laws.

<u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 230 (3d Cir. 2007) (emphasis in original) (citation omitted).

is considered to be unprovided for "when no jurisdiction's interests would be impaired if its laws were not applied." Budget Rent-A-Car Sys., Inc. v. Chappell, 407 F.3d 166, 170 (3d Cir. 2005). In unprovided for tort cases, we use the lex loci delicti, or place of the wrong rule, and apply the law of the state where the harm occurred. Id. (citation omitted)

A true conflict occurs when "both jurisdictions' interests would be impaired by the application of the other's laws." Hammersmith, 480 F.3d at 230 (emphasis in original) (citations omitted). When a true conflict exists, a court must decide which state has the "greater interest in the application of its law." Cipolla v. Shaposka, 267 A.2d 854, 856 (Pa. 1970). Pennsylvania courts do this by considering the factors from the Second Restatement of Conflict of Laws. See Griffith v. United Air Lines, Inc., 203 A.2d 796, 805-06 (Pa. 1964); see also Troxel v. A.I. duPont Inst., 636 A.2d 1179, 1180-81 (Pa. Super. Ct. 1994). In personal injury cases, we first look to Section 145(2) of the Restatement (Second) of Conflicts which sets forth the contacts to be considered in a personal injury choice of law analysis. These contacts include:

> (a) the place where the injury occurred;
> (b) the place where the conduct causing the injury occurred;
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1983). Courts "evaluate these four factors mindful of the overarching choice-of-law principles enumerated in § 6 of the Restatement (Second)," which are

> "(a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of the other interested states and the relevant interests of those states in determination of a particular issue;
> (d) the protection of justified expectations;
> (e) the basic policies underlying the particular field of law;
> (f) certainty, predictability and uniformity of result; and
> (g) ease in the determination and application of the law to be applied."

<u>Marks v. Redner's Warehouse Mkts.</u>, 136 A.3d 984, 988 (Pa. 2016) (quoting the Restatement (Second) of Conflict of Laws § 6 (1983)).

We first must determine if there is a conflict between the laws of the three relevant states. While Defendant asserts that there is no conflict between the laws of the three states here, we conclude otherwise.  First, there appear to be significant differences between the laws in Pennsylvania, New York, and New Jersey concerning bus accidents.  Both New York and Pennsylvania have adopted a strict jerk-and-jolt doctrine, which exposes bus drivers and their employers to liability only in the most egregious driving circumstances.  Under Pennsylvania's jerk and jolt doctrine, a plaintiff must show that the:

> jerk or stop of the bus was so unusual and extraordinary as to be beyond . . . her reasonable anticipation by demonstrating: (1) that the stop had an extraordinarily disturbing effect on the other passengers; or (2) evidence of an accident, the manner of the occurrence of which or the effect of which upon the injured person inherently establishes the unusual character of the jerk or jolt.

<u>Authority of Allegheny Cty.</u>, 863 A.2d 84, 90 (Pa. Commw. Ct. 2004) (citing <u>Connolly v. Philadelphia Transp. Co.</u>, 216 A.2d 60, 62 (Pa. 1966); <u>Meussner v. Port Auth. of Allegheny Cty.</u>, 745 A.2d 719, 721 (Pa. Commw. Ct. 2000)).

New York has a similarly stringent doctrine regarding bus injuries:

> To establish a prima facie case of negligence against a common carrier for injuries sustained by a passenger when the vehicle comes to a halt, the plaintiff must establish that the stop caused a jerk or lurch that was unusual and violent.  Proof that the stop was unusual or violent must consist of more than a mere characterization of the stop in those terms by the plaintiff . . . . There must be objective evidence of the force of the stop sufficient to establish an inference that the stop was extraordinary and violent, of a different class than the jerks and jolts commonly experienced in city bus travel and, therefore, attributable to the negligence of defendant.

Andreca v. Cash World Tours, Inc., 22 N.Y.S.3d 878, 878-79 (N.Y. App. Div. 2016) (internal citations and quotations omitted).

In contrast, New Jersey has no such doctrine.  Defendant points to a model civil jury instruction from New Jersey, which states in pertinent part that:

> A common carrier must exercise a high degree of care in starting, stopping or decreasing the speed of a vehicle so as not to imperil the safety of passengers.  A violent stop, jerk or lurch which would have been unlikely to occur if proper care had been exercised justifies the inference of negligence in the operation or maintenance of the vehicle or its brakes.

5.73 CARRIERS FOR HIRE (Approved 6/88), NJ J.I. CIV 5.73 (citing Gaglio v. Yellow Cab Co., 164 A.2d 353 (N.J. Super. Ct. App. Div. 1960)).  However, this jury instruction and the case it cites do not reflect New Jersey's adoption of a "jerk and jolt" doctrine that mirrors those in Pennsylvania and New York.  Rather, while Pennsylvania and New York demand that only a violent and extraordinary jerk or jolt can give rise to a viable negligence claim against a bus driver, New Jersey plainly permits a finding of negligence for any departure from a bus driver's high degree of care in the operation of the bus, and only allows for a special inference of negligence when the driver's conduct results in a violent stop, jerk, or lurch.   See also Sanchez v. Indep. Bus Co., 817 A.2d 318, 322 (N.J. Super. Ct. App. Div. 2003) ("As a common carrier, [the bus company] would owe a high degree of care for the safety of its passengers so as to avoid dangers that are known or reasonably anticipated.").   In sum, New Jersey courts have not adopted a "jerk and jolt" doctrine comparable to that in Pennsylvania and New York.  We therefore conclude that there is a critical difference between New Jersey law and that of New York and Pennsylvania, and that New Jersey bus drivers and operators have greater exposure to liability than their Pennsylvania and New York counterparts.

We further conclude that the states' negligence laws conflict on the issue of comparative fault. New York has adopted the pure comparative fault doctrine meaning that "a plaintiff who is 99% at fault could still recover 1% of damages." Calcano v. Rodriguez, 936 N.Y.S.2d 185, 188 (N.Y. App. Div. 2012) (Catterson, J., concurring) (citing N.Y. C.P.L.R. § 1411 (McKinney 1975)). In contrast, both New Jersey and Pennsylvania use a modified comparative negligence rule pursuant to which plaintiffs are barred from recovery of any damages if they are found to be more than 50% at fault for their injuries. See Brodsky v. Grinnell Haulers, Inc., 853 A.2d 940, 944 (N.J. 2004) (citing N.J. Stat. Ann. § 2A: 15-5.1); Marks, 136 A.3d at 988-89 (citing 42 Pa. Cons. Stat. § 7102) (additional citation omitted). Accordingly, not only does New Jersey's law conflict with the law of Pennsylvania and New York with respect to the jerk and jolt doctrine but, in addition, New York's comparative fault statute conflicts with Pennsylvania and New Jersey's comparative fault rules.

Having identified these actual conflicts, we must now determine whether each is a true conflict, false conflict, or unprovided-for case by examining each state's interests in applying its law to this dispute. Certainly, each state has an interest in applying its comparative fault rule to this dispute. Pennsylvania and New Jersey's modified comparative negligence rule seeks to affect the behavior of not only tortfeasors but also tort victims. Moreover, Pennsylvania has an obvious interest in influencing the conduct of the Ladenheims because they are residents of Pennsylvania, and New Jersey has an understandable interest in applying its law because Ms. Ladenheim engaged in arguably negligent conduct in New Jersey, at least insofar as she sat on the front step of the bus during stop-and-go traffic. New York's rule, on the other hand, aims to compensate a plaintiff for injuries suffered due to a defendant's negligence, even when the plaintiff herself is largely at fault. New York thus has an interest in compensating the

Ladenheims who not only may have been injured in the state on account of Defendant's negligence, but also went to a New York hospital to obtain treatment for Ms. Ladenheim's injuries.

Each state also has an interest in applying its substantive doctrines pertaining to bus driver negligence.  Pennsylvania and New York's interests are implicated in this case because the bus drove through both states, and those states have an interest in providing bus operators and drivers doing business in the state with the liability protection of the "jerk and jolt" doctrine.  New Jersey's interests are also implicated because a New Jersey bus operator employing a New Jersey driver are alleged to have negligently operated a bus in New Jersey when Joyce permitted one passenger to stand during the ride and another to sit on the front step of the bus.  As each state has an interest in applying its law to both the negligence claim and the comparative fault regime, there is a true conflict between the competing state laws.

Under these circumstances, we must determine which state has the greatest interest in the application of its law by applying the factors in the Restatement.  In tort cases, the Restatement tells us to consider the place of injury, the place of the conduct causing the injury, the domicile, residence, or place of business of the parties, and the place where the parties' relationship is centered.  Restatement (Second) of Conflicts of Laws § 145 (1971).  The Restatement further "establishes a presumption in personal injury cases that favors the application of the law of the state where the injury occurred . . . ."  Marks, 136 A.3d at 988 (citing Restatement (Second) of Conflicts of Laws § 146) (1971)).  Here, the place of the harm is unclear – Ms. Ladenheim suffered her injuries on the George Washington Bridge and there is conflicting testimony as to whether the bus was on the New Jersey or New York side of the bridge when Gorlechen fell onto her.  "[W]hen the place of the injury cannot be ascertained, and with respect to the particular

issues, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." Restatement (Second) of Conflict of Laws § 145, cmt. e (1971). Here, New Jersey was the state where most, if not all, of the relevant conduct took place. Joyce's alleged "jerky" driving likely took place, for the most part, in New Jersey. Joyce did not tell Ms. Ladenheim to return to her seat when she sat on the steps of the bus for several minutes – this almost certainly happened in New Jersey since Ms. Ladenheim testified both that she was sitting on the step for five to ten minutes before the accident and that the bus had encountered traffic before reaching the George Washington Bridge. The braking that caused Gorlechen to fall on Ms. Ladenheim occurred in either New Jersey or New York -- we cannot be sure. Therefore, we conclude that the bulk of Defendant's conduct giving rise to Plaintiffs' injuries and this negligence claim occurred in New Jersey.

The other factors, considered in conjunction with the overarching choice of law principles enumerated in § 6 of the Restatement (Second) of Conflict of Laws, do not overcome this strong case for applying New Jersey law. While Plaintiffs are Pennsylvania citizens and the bus picked up the passengers in Pennsylvania, Defendant is a New Jersey corporation and little or none of the relevant conduct occurred in Pennsylvania. New York may have been the place of the injury, but it also may not have been, and so the only certain contacts with New York are that Ms. Ladenheim was taken to a New York hospital following her injury and that the bus was driving the passengers to New York for a wedding. These contacts are incidental at best. This suit, at its core, is a negligence claim brought against a New Jersey company employing a New Jersey driver whose actions in New Jersey are alleged to have caused Plaintiffs' injuries. New

Jersey has the greatest interest in the application of its law and we will therefore apply New Jersey law to this case.

      B.    <u>Negligence</u>

Defendant moves for summary judgment on Plaintiffs' negligence claim, arguing that there is insufficient evidence in the record to support any one of Plaintiffs' three theories of liability: (1) that Joyce negligently operated the bus by stopping short, (2) that Joyce negligently failed to warn Ms. Ladenheim of the dangers of sitting on the stairs, and (3) that Defendant was negligent per se because Joyce violated a federal regulation when he operated the bus with Ms. Ladenheim sitting on the steps, in front of a "white line" located at the top of the stairs. Specifically with regard to Joyce's negligent operation of the bus, i.e., the first of the three negligence theories, Defendant argues that the jerk and jolt doctrine, applicable in Pennsylvania and New York, precludes liability under the circumstances of this case because there is no evidence that the bus's movement was so unusual or extraordinary as to be beyond a passenger's reasonable expectation. We conclude, however, that there is sufficient evidence in the record to support Plaintiffs' negligence claim grounded on Joyce's negligent operation of the bus under the applicable New Jersey law and, thus, we need not resolve Defendant's arguments regarding Plaintiff's alternative liability theories.[3]

_____

[3]We nevertheless note that Plaintiffs' negligence per se claim is based on an assertion that Joyce violated 49 C.F.R. § 393.90 when he operated the bus with Ms. Ladenheim seated on the top step next to him. However, contrary to Plaintiffs' assertion, § 393.90 does not prohibit a driver's operation of a bus when a passenger is in front of the so-called "white line" but, rather, merely mandates the posting of a cautionary sign on the bus. <u>See</u> 49 C.F.R. § 393.90 ("Every bus shall have clearly posted at or near the front, a sign . . . stating that it is a violation . . . for a bus to be operated with persons occupying the prohibited area."). Moreover, the regulation that addresses the actual operation of a bus while a passenger is located near the driver, states that "[n]o person shall drive a bus . . . unless . . . [a]ll <u>standees</u> on the bus are rearward of the <u>standee</u> line or other means prescribed in § 393.90 of this subchapter." 49 C.F.R. § 392.62 (emphases added). Ms. Ladenheim, in contrast, was sitting on the step, not standing in front of the bus's white line. In any event, we need not resolve the question of whether Plaintiffs' negligence

To assert a claim for negligence under applicable New Jersey law, "a plaintiff must establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Development Corp., 119 A.3d 878, 885-86 (N.J. 2015) (citing Townsend v. Pierre, 110 A.3d 52 (N.J. 2015). New Jersey law places special emphasis on the "high degree of care" that common carriers owe for the safety of their passengers. Sanchez v. Indep. Bus Co., 817 A.2d 318, 322 (N.J. Super. Ct. App. Div. 2003) (citing Lieberman v. Port Auth. of New York and New Jersey, 622 A.2d 1295 (N.J. 1993)). Moreover, in New Jersey, as noted above, the mere occurrence of a "violent stop, jerk or lurch" is sufficient to support an inference of negligence. 5.73 CARRIERS FOR HIRE (Approved 6/88), NJ J.I. CIV 5.73 (citing Gaglio, 164 A.2d 353).

In this case, there is no dispute that Defendant owed a duty to ensure Plaintiffs' safety or that Ms. Ladenheim was injured when Gorlechen fell on top of her. Thus, we must only determine whether there is evidence in the record that could support reasonable conclusions that Defendant breached the applicable duty and thereby caused Ms. Ladenheim's injuries. We conclude that there is.

As noted above, other passengers on the bus that day testified that the ride was "jerky," and that the bus driver was "riding the brake." (Julia Strassman Dep. at 22; Sved Dep. at 37.) While many passengers testified that there was nothing unusual about the bus ride, Jeff Sandler testified that Joyce slammed on the brakes, causing Gorlechen to "fly backwards." (Sandler Dep. at 47, 49, 57-60.) Moreover, Ms. Ladenheim testified that, immediately before Gorlechen fell on top of her, she yelled "watch out," Joyce "hit a hard brake," and the bus almost hit the car in front of it. (Mila Ladenheim Dep. at 106.) Mr. Ladenheim testified that the sudden stop

claim can proceed on a negligence per se theory as we deny Defendant's Motion based on our conclusion that Plaintiffs may proceed on one of their alternative theories.

caused him to feel like he was "lifted out of [his] seat" and caused Gorlechen to fly through the air. (Leonard Ladenheim Dep. at 69, 75.) Under these circumstances, we conclude that there are sufficient facts in the record – albeit disputed facts – to support a conclusion that Joyce braked so suddenly and forcibly that he violated his duty to exercise a high degree of care to his passengers and thereby caused Ms. Ladenheim's injuries.

Defendant argues that the uncontested testimony of its expert witness, who analyzed the data collected by the bus as to its speed and acceleration during the trip, indisputably proves that the bus did not come to a sudden stop on the George Washington Bridge. But, as Plaintiffs point out, the record shows that the bus's data recording system is only triggered if the bus decelerates by seven miles-per-hour or more. Given that the accident occurred in stop-and-go traffic on the George Washington Bridge, it is highly possible that the bus was not going seven miles-per-hour immediately preceding the sudden braking which caused Gorlechen to fall on Ms. Ladenheim. This fact, however, does not preclude a jury from finding that the bus stopped suddenly or even violently, particularly in light of the testimony in the record noted above. We therefore conclude that the testimony of Defendant's expert is not conclusive on the issue of negligence.

In sum, we conclude that the record contains sufficient facts upon which a reasonable jury, considering the evidence in the light most favorable to Plaintiffs, could find that Plaintiffs have established the four elements of negligence with regard to their claim that Joyce negligently operated the bus by stopping short. We therefore conclude that there are genuine issues of material fact that preclude the entry of summary judgment and deny Defendant's Motion for Summary Judgment insofar as it seeks judgment in Defendant's favor on Plaintiff's claim of negligence.

C.      Plaintiffs' Motion for Leave to Amend the Complaint

Plaintiffs have filed a Motion for Leave to Amend the Complaint, which seeks to add a claim for punitive damages.  Pursuant to Fed. R. Civ. P. 15(a)(2), a party can only amend its pleadings at this late stage of the proceedings with either the court's leave or the opposing party's written consent.  Rule 15(a)(2) further states that "[t]he court should freely give leave when justice so requires."  Id.  While courts have discretion whether to grant leave to amend, they should generally permit amendment in the absence of undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, and futility of amendment.  See Foman v. Davis, 371 U.S. 178, 182 (1962) (stating that leave to amend should be denied only when there is a justifiable reason); see also Lorenz v. CSX Corp., 1 F.3d 1406, 1413-14 (3d Cir. 1993) (same). "An amendment is futile if 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'"  Pine Grove Manufactured Homes v. Indiana Lumbermens Mut. Ins. Co., Civ. A. No 08-1233, 2010 WL 500413, at *2 (M.D. Pa. Feb. 5, 2010) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).

Under New Jersey law, a plaintiff may be awarded punitive damages only after proving, by clear and convincing evidence, "that the harm suffered was the result of the defendant's acts or omissions . . . [that] were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions."  N.J. Stat. Ann. § 2A:15-5.12.  A plaintiff can prove that a defendant's act was wanton and willful by showing "a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences."  Smith v. Whitaker, 734 A.2d 243, 254 (N.J. 1999) (quotation omitted); N.J. Stat. Ann. § 2A:15-5.10 (defining wanton and willful disregard). But "[n]egligence, no matter how gross, cannot form the basis of an award for punitive

damages." <u>Hottenstein v. City of Sea Isle City</u>, 977 F. Supp. 2d 353, 370 (D.N.J. 2013) (internal citations and quotations omitted).

Plaintiffs argue that the evidence adduced in discovery supports a claim that Joyce acted with wanton and reckless disregard of Ms. Ladenheim's safety because he knowingly permitted Ms. Ladenheim to sit on the steps, permitted Gorlechen to stand in the aisle, did not tell either Ms. Ladenheim or Gorlechen that they were "in peril of injury," and admitted that he did not repeat the instruction he gave at the start of the trip for passengers to stay in their seats. Such evidence, however, is simply insufficient to establish that Joyce acted with "actual malice or . . . a wanton and willful disregard of persons" who could be harmed. N.J. Stat. Ann. § 2A:15-5.12. While Joyce acknowledged that where Ms. Ladenheim was sitting "was not the greatest place to sit" (Joyce Dep. at 35), such acknowledgment simply does not support a reasonable conclusion that Joyce had "knowledge of a high degree of probability of harm and reckless indifference to the consequences." <u>Smith</u>, 734 A.2d at 254. Moreover, Plaintiffs have pointed to no evidence of action by Joyce that evidences that he had such knowledge or reckless indifference, and we are aware of none. Accordingly, although the evidence in the record may support a negligence claim, it does not support a claim for punitive damages. Because the record evidence cannot support the imposition of punitive damages, any amendment to add a claim for punitive damages to the Complaint is futile. We therefore deny Plaintiffs' Motion for Leave to Amend the Complaint.

**IV.     CONCLUSION**

For the foregoing reasons, we deny Defendant's Motion for Summary Judgment and also

deny Plaintiffs' Motion to Amend the Complaint.  An appropriate Order follows.


BY THE COURT:


/s/ John R. Padova, J.
_____
John R. Padova, J.